**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**  ___22-MJ-03333-Torres_____

United States of America,

v.

Daniel Hernandez,

_____Defendant._____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?     No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:     _*Eli S. Rubin*_____

Eli S. Rubin
Assistant United States Attorney
Court ID No.     A5502535
99 N.E. 4th Street
Miami, Florida 33132
Tel: 305-961-9247
Fax: 305-530-6158
Email: Eli.Rubin@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   22-MJ-03333-Torres |
| | ) | |
| Daniel Hernandez, | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 2020 through March 2021___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Bank Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_David Brant_   ID 204
*Complainant's signature*

Special Agent David Brant, FDIC-OIG
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by telephone.

Date: **Aug. 8, 2022**

*Judge's signature*

City and state:   ___Miami, Florida___      Hon. Edwin G. Torres, Chief U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, David Brant, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Deposit Insurance Corporation Office of Inspector General ("FDIC-OIG") and have been so since September 2019.  Prior to that, I was a Special Agent with the Internal Revenue Service - Criminal Investigation ("IRS-CI") for approximately ten years.  Throughout the course of my career, I have participated and directed numerous criminal investigations involving identity theft, fraud against the government, bank fraud, and many other illegal schemes affecting the government and financial institutions. Through my training and experience, I am familiar with the tactics, methods, and techniques individuals use to commit various types of fraud and money laundering schemes.

2.      This affidavit is made in support of a criminal complaint charging Daniel Hernandez ("HERNANDEZ") with Conspiracy to Commit Bank Fraud in violation of Title 18, United States Code, Section 1349.

3.      This affidavit is based on my personal investigation and investigation by others, including federal law enforcement officials whom I know to be reliable and trustworthy.  The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means.  This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## OVERVIEW OF CERTAIN CARES ACT RELIEF

4.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, was a federal law enacted in or around March 2020 designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

5.     Two sources of relief provided by the CARES Act were the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program.

6.     Under the PPP, the CARES Act authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses.  Among other increases in PPP funding, in or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan had to provide documentation to the lending institution showing their payroll expenses.  Typically, businesses would supply documents showing the amount of payroll taxes reported to the Internal Revenue Service ("IRS").

8.     A PPP loan application had to be processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the U.S. Small Business Administration ("SBA").  Data from the

application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9.      PPP loan proceeds had to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

10.     The EIDL program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

11.     The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.  The amount of the advance was determined by the number of employees the applicant certified having.  The advances did not have to be repaid.  EIDL applications are submitted directly to the SBA and processed by the agency or designated contractor.  In order to obtain an EIDL and advance, a qualifying business had to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  The applicant must also certify that all of the information in the application is true and correct to the best of the applicant's knowledge.  EIDL funds can be used as working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt

incurred at any time.

12.     EIDL applications were submitted directly to the SBA and processed by the SBA with support from a government contractor.  All EIDL-related payments are processed by the SBA from Denver, Colorado.

## OVERVIEW OF HERNANDEZ'S CONSPIRACY

13.     HERNANDEZ was the South Florida Retail Market Manager for Bank 1, one of the nation's largest retail banks.  When the PPP program began, HERNANDEZ oversaw over 80 bank employees and approximately 27 bank branches.  One Bank 1 document referred to him as the "second highest point of escalation [and] contact" within South Florida.

14.     From the inception of the PPP process, HERNANDEZ abused his position within the bank to defraud the U.S. government, his employer, and another leading national bank, Bank 2, for his personal gain.  HERNANDEZ conspired with bank customers, a former Bank 1 employee, and others to submit over 90 false and fraudulent PPP loan applications at Bank 1 and Bank 2.  HERNANDEZ recruited applicants to apply for PPP loans; connected applicants with co-conspirators who could help provide false and fraudulent documentation; and used his position at the bank to try to ensure that certain applications were reviewed and approved.  Importantly, HERNANDEZ also advised applicants on how to launder the loan proceeds to shield the fraud from detection.  In return, HERNANDEZ received a commission on every loan issued.

15.     HERNANDEZ did not stop at PPP loans.  He also conspired with others to submit false and fraudulent EIDL applications with the SBA.  HERNANDEZ again received a commission on every EIDL issued.

16.     HERNANDEZ's conspiracy attempted to defraud the PPP program out of more than $30 million and the EIDL program out of more than $7 million.  To date, the investigation has identified over $15 million in fraudulent loans issued.

*Background*

17.     HERNANDEZ was a resident of Miami-Dade County in the Southern District of Florida.  He began working for Bank 1 in approximately September 2015.  Prior to working at Bank 1, he worked at Bank 2.

18.     Conspirator 1 conspired with HERNANDEZ to apply for, and receive, three false and fraudulent PPP loans on behalf of two Miami-based entities that he controlled, netting over $800,000 in fraud proceeds.  Conspirator 1 also recruited applicants to apply for false and fraudulent PPP loans through HERNANDEZ on behalf of entities they controlled. Conspirator 1, HERNANDEZ, and their co-conspirators submitted over 20 false and fraudulent applications, netting nearly $5.5 million in fraud proceeds.

19.     Conspirator 2 worked with HERNANDEZ and Conspirator 3 to file over 40 false and fraudulent PPP loan applications on behalf of co-conspirators' companies.  Conspirator 2 recruited applicants; submitted fraudulent applications on co-conspirators' behalf; directed co-conspirators on how to apply; and worked with HERNANDEZ and Conspirator 3 to help have the applications reviewed and approved.  When a loan was issued to a company that Conspirator 2 recruited, Conspirator 2 personally received a portion of the loan proceeds and shared a portion, at HERNANDEZ's direction, in U.S. currency with HERNANDEZ and/or Conspirator 3.

20.     Conspirator 3 was a former employee of Bank 1.  His employment with the bank was terminated in approximately January 2021 after he submitted, at Bank 1, two false and fraudulent PPP loan applications on behalf of entities he controlled.  HERNANDEZ recruited

Conspirator 3 into the conspiracy knowing that Conspirator 3 had been dismissed for engaging in PPP fraud. In furtherance of the conspiracy, Conspirator 3 used his banking expertise to, *inter alia*, (i) help HERNANDEZ open accounts at Bank 1 for co-conspirators who then applied for fraudulent PPP loans; (ii) advise Conspirator 2 on how best to respond to requests for additional information from Bank 1 employees concerning fraudulent PPP loan applications; and (iii) monitor the status of fraudulent loan applications that co-conspirators submitted. Conspirator 3 also submitted false and fraudulent EIDL applications on behalf of co-conspirators. As described more fully below, Conspirator 3 maintained a spreadsheet listing over 80 fraudulent PPP loan applications and over 50 fraudulent EIDL applications that he, HERNANDEZ, and Conspirator 2 worked on. Conspirator 3 received a portion of every successful loan application he worked on, and gave HERNANDEZ the same.

21. Banks 1 and 2 are financial institutions federally insured by the FDIC. Bank 1 is headquartered in New Jersey. Bank 2 is headquartered in North Carolina. Both banks participated in the SBA's PPP as lenders and, as such, were authorized to lend funds to eligible borrowers under the terms of the PPP.

## HERNANDEZ CONSPIRED WITH CONSPIRATOR 1 TO
## OBTAIN APPROXIMATELY 21 FALSE AND FRAUDULENT PPP LOANS

22. According to Conspirator 1, Conspirator 1 met HERNANDEZ prior to the PPP program when HERNANDEZ helped Conspirator 1 obtain a line of credit for one of Conspirator 1's businesses. At HERNANDEZ's request, Conspirator 1 paid HERNANDEZ a commission for the line of credit in U.S. currency. Conspirator 1 handed HERNANDEZ the commission inside HERNANDEZ's office in a Bank 1 branch in the Miami neighborhood of Brickell.

23. According to Conspirator 1, in early 2020, HERNANDEZ notified Conspirator 1 of the PPP program and instructed him how to apply online. Based on WhatsApp messages

between HERNANDEZ and Conspirator 1 that Conspirator 1 provided to law enforcement, HERNANDEZ texted Conspirator 1 photographs of what appeared to be internal Bank 1 documents identifying what documents were required to prove an applicant's payroll. Conspirator 1 texted HERNANDEZ at a phone number ending in 4035 (the "HERNANDEZ Cell Phone Number"). That number is displayed as HERNANDEZ's in HERNANDEZ's signature block in his Bank 1 email account.

24.    HERNANDEZ and Conspirator 1 agreed that Conspirator 1 would submit applications online and HERNANDEZ would work to have the applications reviewed and approved by specific bank employees. In certain circumstances, HERNANDEZ would help applicants open an account at Bank 1 prior to the submission of an application. Conspirator 1 would review every application with HERNANDEZ prior to submission and notify HERNANDEZ whenever applications were submitted. Conspirator 1 was to submit applications on behalf of entities he controlled; recruit others on whose behalf he would apply; and help HERNANDEZ with applicants that HERNANDEZ referred to Conspirator 1.

25.    According to Conspirator 1, HERNANDEZ advised Conspirator 1 how much to request in loan proceeds independent of a company's actual finances. Further, HERNANDEZ wanted to be notified when an application was submitted so that he could direct its review to someone HERNANDEZ trusted. HERNANDEZ and Conspirator 1 would charge each applicant a fee in return for their services. According to Conspirator 1, HERNANDEZ initially charged 12%, but increased it to 15%.

26.    According to Conspirator 1, HERNANDEZ had a very specific and clear requirement for all applicants they worked with: after receiving the loan proceeds, the applicant

had to transfer the loan proceeds out of Bank 1 so that Bank 1 could not trace how the funds were used.

27.     In April, May, and June 2020, Conspirator 1 submitted approximately 21 applications at HERNANDEZ's direction.  Bank 1 records, corporate emails, Conspirator 1's own emails, obtained pursuant to a search warrant, and copies of WhatsApp messages, confirm Conspirator 1's account.  For example:

- On approximately April 10, 2020, Conspirator 1 emailed HERNANDEZ, at his Bank 1 email account, information concerning Florida Entity 1 and a copy of the driver's license of Florida Entity 1's owner.  HERNANDEZ forwarded Conspirator 1's email to a Bank 1 employee but deleted all references to Conspirator 1.  That Bank 1 employee immediately opened an account at Bank 1 in the name of Florida Entity 1 and ending in 9148 ("Account 9148").

- Two days later, approximately Sunday, April 12, 2020, Conspirator 1 texted HERNANDEZ, at the HERNANDEZ Cell Phone Number, that Conspirator 1 was planning to submit PPP applications on behalf of three companies, including Florida Entity 1.

- That same day, HERNANDEZ replied, "Llámame[.]"  (English translation: Call me.)

- Approximately that same day, Conspirator 1 submitted a false and fraudulent PPP loan application on behalf of Florida Entity 1.  Despite the fact that the company had not reported any employment activity with the Florida Department of Revenue, as all Florida-based employers are required to do, and had not filed a single tax return with the IRS, the PPP loan application stated that the company had 27 employees and had an average monthly payroll of $210,600.

8

- Later that same day, at approximately 9:28 p.m., HERNANDEZ and Conspirator 1 texted about the proprietor of Florida Entity 1's Instagram account.

- Minutes later, at approximately 10:09 p.m., HERNANDEZ used his Bank 1 email account to email Bank 1 employee "N.A." and ask that she complete reviewing the PPP application for Florida Entity 1 and notify HERNANDEZ when complete.

- Approximately the following day, April 13, 2020, N.A. emailed HERNANDEZ, "DONE."

- On approximately April 20, 2020, Florida Entity 1 received $526,500 in fraud proceeds into Account 9148.

- On approximately April 28, 2020, the proprietor of Florida Entity 1 transferred $480,000 of the $526,500 loan to a newly opened account in the name of Florida Entity 1 at Bank 3.

28.     Of the 21 companies for whom Conspirator 1 and HERNANDEZ obtained PPP loans, not a single one had reported to the Florida Department of Revenue the same number of employees listed in their respective PPP loan application.  At the time their PPP loans were submitted, only one of the 21 entities had reported any employment activity at all.  That applicant reported a single employee; in its PPP loan application, that same company stated that it had 16 employees.

29.     To date, the investigation has received information from the IRS concerning eight of the 21 applicants.  That information establishes that all eight applicants included at least one false and fraudulent IRS tax form in their respective PPP loan application.  Information requests concerning the remaining 13 entities are pending.

30.     Further, nearly all of the applicants, pursuant to HERNANDEZ's requirement, quickly transferred the majority of loan proceeds out of Bank 1.  For example:

- Florida Entity 2 received a fraudulent $232,500 PPP loan from Bank 1 on approximately April 20, 2020, and wire transferred $202,500 out of the account on approximately April 23, 2020.

- Florida Entity 3 received a fraudulent $396,000 PPP loan from Bank 1 on approximately April 20, 2020, and wire transferred $337,000 out of the account on approximately April 23, 2020.

- Florida Entity 4 received a fraudulent $414,000 PPP loan from Bank 1 on approximately April 20, 2020, and wire transferred $370,000 out of the account on approximately April 24, 2020.

- Florida Entity 5 received a fraudulent $232,500 PPP loan from Bank 1 on approximately April 20, 2020, and wire transferred $209,250 out of the account on approximately April 27, 2020.

31.     According to Conspirator 1, Conspirator 1 received his and HERNANDEZ's commission in U.S. currency from each applicant.  Conspirator 1 then delivered the commission to HERNANDEZ.   HERNANDEZ visited Conspirator 1's apartment twice to pick-up commissions, and Conspirator 1 visited HERNANDEZ at HERNANDEZ's home numerous times. According to Conspirator 1, while Conspirator 1 was in the doorway of HERNANDEZ's home dropping off a commission, a Bank 1 employee arrived.  HERNANDEZ walked outside and gave the employee at least a portion of the commission.  HERNANDEZ returned to Conspirator 1 and told Conspirator 1 something to the extent that that employee was always on drugs.

***HERNANDEZ Tried to Charge Applicants to Have Their PPP Loans Forgiven***

32.     In approximately June 2020, news articles began to circulate regarding the forgiveness aspect of the PPP process.  According to Conspirator 1, HERNANDEZ wanted to charge their applicants an additional fee to have their loans forgiven.  Conspirator 1 objected, arguing that was unfair to the applicants.  HERNANDEZ reportedly responded by saying something to the extent that the applicants were already receiving more money than they were entitled to.

33.     In light of their disagreement, HERNANDEZ and Conspirator 1 stopped working with each other in approximately June 2020.

## HERNANDEZ RECRUITED CONSPIRATOR 2 INTO THE CONSPIRACY

34.     According to Conspirator 2, HERNANDEZ and Conspirator 2 met in approximately 2017 or 2018 when Conspirator 2 received a line of credit from Bank 1.  Conspirator 2 paid HERNANDEZ a percentage of the loan in U.S. currency as compensation for his assistance.

35.     Soon thereafter, Conspirator 2 began recruiting others to receive lines of credit from HERNANDEZ at Bank 1.  HERNANDEZ reportedly gave Conspirator 2 a commission in U.S. currency for each line of credit Conspirator 2 directed towards HERNANDEZ.

36.     According to Conspirator 2, after passage of the CARES Act, HERNANDEZ called Conspirator 2 and offered to help him obtain a PPP loan at Bank 1.  HERNANDEZ explained to Conspirator 2 how the PPP program worked and what supporting documentation Conspirator 2 would need to get a loan.  Conspirator 2 told HERNANDEZ that Conspirator 2's company, Florida Entity 6, did not have employees, payroll, or other items necessary to apply.  HERNANDEZ said that that would not be a problem.  HERNANDEZ provided Conspirator 2 with Conspirator 1's name and telephone number, and said that Conspirator 1 could help Conspirator 2 get the required documentation.  Conspirator 2 saved Conspirator 1's phone number, ending in 7985, in his phone

11

as "[Misspelling of Conspirator 1's First Name] Daniel Prestamo Sba [Bank 1]." "Daniel" is HERNANDEZ's first name. "Prestamo" is Spanish for loan and "Sba" refers to the SBA, the guarantor of all PPP loans. '[Bank 1]" was HERNANDEZ's employer.

37.     Following HERNANDEZ's instructions, on approximately April 12, 2020, Conspirator 1 emailed Conspirator 2 a false and fraudulent PPP loan application on behalf of Florida Entity 6. The application sought $252,000 in loan proceeds and included six false and fraudulent Internal Revenue Service ("IRS") tax returns to support the application.[1] At the time, Florida Entity 6 did not have a single employee.

38.     Approximately two days later, April 14, 2020, HERNANDEZ, using his Bank 1 email account, emailed Conspirator 2 a link where Conspirator 2 could upload his PPP loan application for submission.

39.     Conspirator 2 initially submitted the application at Bank 1, but soon withdrew it. He agreed with HERNANDEZ, however, to find other applicants and, at HERNANDEZ's direction, have them apply for PPP loans on behalf of entities that they controlled.

40.     And that is what HERNANDEZ and Conspirator 2 did. Over the following four months in 2020, Conspirator 2 helped at least 11 entities submit at least 11 false and fraudulent PPP loan applications. Many of the applications sought exactly $252,000, the exact amount sought in the fraudulent PPP loan application Conspirator 2 received from Conspirator 1, or a multiple thereof.

41.     For example, Conspirator 2 worked with Willian Alexander Posada Sandrea ("Posada") to submit a false and fraudulent PPP loan application at Bank 1 on behalf of Autenticos

---

[1] In May 2021, then Chief United States Magistrate Judge O'Sullivan issued a search warrant for Conspirator 1's email account.

Autos Sales Corp. ("Autenticos Autos"), a Miami-based entity that Posada controlled. The application requested $504,000, exactly twice the amount requested in the application that Conspirator 1 prepared for Conspirator 2.

42.     On approximately May 4, 2020, HERNANDEZ used his Bank 1 email account to as Bank 1 employees "J.E." to try and approve Autenticos's outstanding loan application. The loan was subsequently approved and Posada received $504,000 in fraud proceeds.

43.     On July 20, 2022, Posada pled guilty to conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349. *See* Minute Entry, *United States v. Willian Alexander Posada Sandrea*, 22-20194-CR-MARTINEZ (S.D. Fla. July 20, 2022).

44.     According to Conspirator 2, Conspirator 2 paid HERNANDEZ approximately ten percent of the fraud proceeds that his recruits received. Conspirator 2 picked up the commission in U.S. currency from the applicants and paid HERNANDEZ his share of the proceeds in person in U.S. currency.

## HERNANDEZ RECRUITED CONSPIRATOR 3 INTO THE CONSPIRACY AFTER CONSPIRATOR 3 WAS FIRED FOR ENGAGING IN PPP FRAUD

45.     On approximately January 14, 2021, the SBA and Treasury Department made available to the public additional PPP funds to allow eligible borrowers to receive a second PPP loan.

46.     That same day, Conspirator 2 texted HERNANDEZ a link, via WhatsApp, to a press release announcing the re-opening of the PPP.[2] Conspirator 2 added, "Ya tengo los soldados listos jajja." (English translation: I already have the soldiers ready. Haha.) HERNANDEZ replied

---

[2] Co-Conspirator 1 provided law enforcement photographs of text messages he exchanged with HERNANDEZ over WhatsApp.

with a thumbs-up emoji.

47.     Conspirator 2 and HERNANDEZ continued to text each other that evening:

**CONSPIRATOR 2**: "Espero las condiciones y listo[.]" (English translation: I wait for the conditions and ready[.])
**HERNANDEZ**: "Mañana." (English translation: Tomorrow.)
**CONSPIRATOR 2**: "Y con cualquier banco no[¿]" (English translation: And with any bank, no?)
**HERNANDEZ**: 100%
**CONSPIRATOR 2**: "Bellizimooooo[.]  Este es nuestro año[.]"  (English translation:  Beautifulllll[.]  This is our year[.]")
**HERNANDEZ**: "110%[.]"

### *HERNANDEZ Recruited Conspirator 3 into the Conspiracy*

48.     HERNANDEZ served as Conspirator 3's supervisor prior to Conspirator 3's dismissal from the bank.  According to Conspirator 3, HERNANDEZ participated in discussions at the bank regarding the fraudulent PPP loan applications Conspirator 3 had submitted and therefore knew the basis for Conspirator 3's dismissal.  Knowing this, HERNANDEZ recruited Conspirator 3 into the conspiracy in approximately January 2021.

49.     According to Conspirator 3, HERNANDEZ told Conspirator 3 that Conspirator 2 would be in touch with a business proposal.  Conspirator 3 said that one of the reasons HERNANDEZ recruited Conspirator 3 into the conspiracy was because HERNANDEZ did not want to be directly involved in the process and wanted to protect himself.

50.     On approximately January 22, 2021, HERNANDEZ, via WhatsApp, provided Conspirator 2 with Conspirator 3's phone number.  Conspirator 2 saved the number in his phone as "[Conspirator 3's First Name] Daniel Sba."  "Daniel" is HERNANDEZ's first name and "Sba" refers to the SBA, the guarantor of all PPP loans and processor of the EIDL program.

51.     In furtherance of the conspiracy, Conspirator 3 worked on filing fraudulent EIDL applications and assisting with false and fraudulent PPP loan applications submitted at Bank 1.

14

***Conspirator 3 Kept a List of the Conspiracy's Loan Applications***

52.     On approximately January 27, 2020, Conspirator 2 texted Conspirator 3 several photographs of filled-out forms titled "Economic Disaster Relief Program," along with one or more driver's licenses and social security cards.  The forms, which included information about certain companies' revenue, payroll, and number of employees, appeared to constitute information Conspirator 3 would use to submit EIDL applications online.  Upon receiving the messages, and in light of how many applications were being submitted overall, Conspirator 3 replied, "Wow[.] Lol.  Menos mal que tengo un Excel para tener control. [Smiling face emoji.]" (English translation: Wow. Lol.  Good thing I have an Excel to have control.)

53.     In approximately May 2021, then Chief Magistrate Judge John J. O'Sullivan issued a search warrant for one of Conspirator 3's email accounts.  A review of responsive material identified a workbook that De Leon maintained that listed over 50 EIDL applications and over 80 PPP applications.  One spreadsheet, titled "Master," listed the "Business Name," "Owners [sic] Name," and "Loan # [Number]" for each EIDL application the conspiracy worked on.  The spreadsheet also had an entry for who referred the applicant to the conspiracy, for example HERNANDEZ, Conspirator 2, Conspirator 3, or someone else.  The spreadsheet also had an entry for "Fee %," the amount the conspiracy was to charge the applicant should the loan go through.

54.     On approximately January 27, 2021, HERNANDEZ, using the email address dhsh72@gmail.com, forwarded to Conspirator 3 three filled-out "Economic Disaster Relief Program" forms.  The forms contained information about three entities controlled by the same individual.  Conspirator 3 subsequently filed identical fraudulent EIDL applications on behalf of two of the entities and recorded the applications on his spreadsheet.  Neither application was approved.

15

55.     On another spreadsheet, titled "PPP," Conspirator 3 recorded information for over 80 PPP loan applications filed at Bank 1, including the "Loan #," "Req[uested] Amount," "Fee %," and who at Bank 1 was reviewing the loan.  This latter field was titled "Decision" and populated with numerous Bank 1 employees.

56.     Conspirator 3 told law enforcement that the loans listed on the spreadsheets were fraudulent.  He said that the purported business owners were just trying to get "free money" before the program expired.

57.     Conspirator 3 said that he reviewed the spreadsheet with HERNANDEZ at least once.  On one occasion, Conspirator 3 brought his own laptop to HERNANDEZ's home, printed out the spreadsheets from HERNANDEZ's color printer, and reviewed the spreadsheet with HERNANDEZ.  Conspirator 3 subsequently deleted the spreadsheets at HERNANDEZ's direction.[3]

58.     In their text messages, Conspirators 2 and 3 were explicit regarding the fraudulent nature of the applications.  For example, on approximately February 10, 2021, regarding the submission of certain PPP loan applications at Bank 1, Conspirator 3 texted Conspirator 2 over WhatsApp, "Recuerda de tratar de enviar los estados de cuentas de [Bank 4] al menos que sean reales de [Bank 2].  Si se puede enviar tax returns para las excepciones seria perfecto ya que los taxes no lo pueden verificar."  (English translation: Remember to try to send [Bank 4] account statements unless they are real from [Bank 2].  If tax returns can be sent for exceptions it would be perfect as the taxes cannot be verified.)

---

[3] Law enforcement preserved a copy of the email account in which the spreadsheets were saved prior to Conspirator 3's deletion.  Law enforcement subsequently obtained a copy of the spreadsheets pursuant to a search warrant.

59.     Conspirators 2 and 3 referenced HERNANDEZ often throughout their text messages.  For example:

a.  On approximately January 25, 2021, Conspirator 2 sent Conspirator 3 photographs of one or more "Economic Disaster Relief Program" forms along with someone's driver's license and social security card.  Conspirator 2 wrote, "Ahi tienes tres mas . . . Se las mande a Daniel[.]" (English translation:  Here you have three more . . . I sent them to Daniel[.])  "Daniel" refers to HERNANDEZ.

b.  On January 29, 2021, Conspirator 3 texted, "Me lo envio Danny con un grupo de los tuyos.  Pens[é] que estaban todos juntos.  Dejame ver a Danny entonces." (English translation: Danny sent it to me with a group of yours.  I thought that they were all together.  Let me see Danny then.)  "Danny" refers to HERNANDEZ.

c.  On February 5, 2021, regarding how to respond to a Bank 1 employee's questions about a fraudulent PPP application, Conspirator 3 texted, ". . . Madasela a ella. Tengo a Danny revisando las aplicaciones ahora mismo conmigo[.]" (English translation:   Send it to her [i.e., the Bank 1 employee].   I have Danny revising/reviewing the same applications with me.)   "Danny" refers to HERNANDEZ.

d.  On February 23, 2021, Conspirator 3 texted,"Estoy con Danny mirando todas.  Pero estamos también en el teléfono con un jefe grande[.]" (English translation: I am with Danny looking at all of them.  But we are also on the phone with a big boss.) "Danny" refers to HERNANDEZ.

***As Bank 1 Began Asking Questions, HERNANDEZ Tried to Evade Bank Detection***

60.     In approximately March 2021, Bank 1 employees began investigating certain PPP

loan applications that Conspirator 2 had filed at HERNANDEZ's direction. The bank froze at least one account that had received one of the conspiracy's loans. As a result, HERNANDEZ, Conspirator 2, and Conspirator 3 spoke multiple times a day to strategize how to evade detection.

61.     HERNANDEZ told Conspirators 2 and 3 that the bank would not contact law enforcement if it did not sustain a financial loss on any of the suspicious loans. Consequently, HERNANDEZ directed Conspirator 2 to tell the applicants to try and return the loan proceeds of any loan where the corresponding bank account was frozen. Conspirator 2 recorded numerous calls between himself, HERNANDEZ, and/or Conspirator 3, and provided copies to law enforcement. HERNANDEZ stated on the calls that he would return his commission to ensure that the applicants paid back the loans in full so that law enforcement would not be involved.

62.     Throughout the calls, HERNANDEZ was adamant that the bank could not find out about his involvement in the conspiracy. In one telephone call, HERNANDEZ and Conspirator 2 discussed an individual whom HERNANDEZ referred to Conspirator 2 (and who had received three false and fraudulent PPP loans totaling approximately $882,000). During the call, HERNANDEZ told Conspirator 2 that HERNANDEZ could not tell bank investigators the truth concerning the loans: "Sí, no, no le puedo decir que sé detalles, huevón. Si digo que sé detalles, no jodas. [se ríe] Me tiro del barranco." (English translation: If I say that I knew details, fuck. [laughs] Might as well jump off of a cliff.)

63.     In sum, for roughly one year, HERNANDEZ agreed with Conspirator 1, Conspirator 2, Conspirator 3, and others, to knowingly submit false and fraudulent PPP and EIDL loan applications. As described above, the evidence of HERNANDEZ's knowledge of the fraud includes:

    a. HERNANDEZ instructed Conspirator 1 on how large of a PPP loan to apply for

independent of an applicant's actual finances;

b.  HERNANDEZ directed Conspirator 1 to notify HERNANDEZ when PPP loan applications were submitted so that HERNANDEZ could direct which Bank 1 employees reviewed the application;

c.  HERNANDEZ required that certain applicants transfer their loan proceeds out of Bank 1 accounts so that Bank 1 could not trace the applicants' use of the proceeds;

d.  HERNANDEZ encouraged Conspirator 2 to apply for a PPP loan knowing Conspirator 2 did not have employees and other items necessary to apply;

e.  HERNANDEZ directed Conspirator 2 to work with Conspirator 1, who subsequently prepared a fraudulent PPP loan application on behalf of Conspirator 2's company;

f.  HERNANDEZ recruited Conspirator 3 into the conspiracy knowing that Conspirator 3 had just been dismissed from Bank 1 for engaging in PPP fraud;

g.  HERNANDEZ used his personal email account to forward to Conspirator 3 EIDL application forms containing false and fraudulent information, which Conspirator 3 used to file additional fraudulent applications;

h.  HERNANDEZ received tens of thousands of dollars in cash for assisting PPP and EIDL applicants to fraudulently obtain loan proceeds;

i.  HERNANDEZ took steps to conceal his involvement in the conspiracy, even directing conspirators to destroy evidence of the fraud, and actively sought to prevent Bank 1 from notifying law enforcement of at least some of the loans obtained by the conspiracy.

## CONCLUSION

64.     Based on my training and experience, and the information provided in this affidavit,

I respectfully submit that there is probable cause to believe that:

From in or around April 2020, and continuing through in or around March 2021, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, DANIEL HERNANDEZ, did willfully, that is, with intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Conspirator 1, Conspirator 2, Conspirator 3, and others, to commit an offense against the United States, that is, to knowingly execute, and cause the execution of, a scheme and artifice to defraud one or more financial institutions, including Banks 1 and 2, which scheme and artifice did employ a material falsehood, and knowingly, and with intent to defraud, execute, and cause the execution of, a scheme and artifice to obtain money and funds owned by, and under the custody and control of, one or more financial institutions, by means of false and fraudulent pretenses, representations, and promises, relating to a material fact, in violation of Title 18, United States Code, Sections 1344(1) and (2), and 1349.

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
David Brant
Federal Deposit Insurance Corporation
Office of Inspector General
Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of August, 2022, in Miami, Florida.

_____
HONORABLE EDWIN G. TORRES
CHIEF UNITED STATES MAGISTRATE JUDGE

20