UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>22-20529-CR-KMM</u>

UNITED STATES OF AMERICA

v.

DANIEL HERNANDEZ,

      **Defendant.**

_____/

**UNITED STATES' UNOPPOSED MOTION FOR
PRELIMINARY ORDER OF FORFEITURE**

Pursuant 18 U.S.C. § 982(a)(2)(A), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States of America, by and through the undersigned Assistant United States Attorney, hereby moves for the entry of a Preliminary Order of Forfeiture against Defendant Daniel Hernandez (the "Defendant") in the above-captioned matter. The United States seeks to forfeit approximately $814,940 in seized U.S. currency. In support of this motion, the United States provides the attached Declaration of Special Agent Darin M. Didier of the Federal Bureau of Investigation ("FBI") and the following factual and legal bases.

    **I.**    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On November 3, 2022, the United States filed an Information charging the Defendant in Count 1 with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Information, ECF No. 14. The Information also contained forfeiture allegations, which alleged that upon conviction of a violation 18 U.S.C. § 1349, the Defendant shall forfeit any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such offense. *See id.* at 7.

The United States has since identified the following additional assets subject to forfeiture:

   i. Approximately $26,900 in U.S. currency, seized on or about March 11, 2021;

   ii. Approximately $16,500 in U.S. currency, seized on or about March 11, 2021;

   iii. Approximately $20,000.00 in U.S. currency, seized on or about March 16, 2021;

   iv. Approximately $20,000.00 in U.S. currency, seized on or about March 29, 2021;

   v. Approximately $22,450.00 in U.S. currency, seized on or about March 29, 2021;

   vi. Approximately $30,030.00 in U.S. currency, seized on or about March 31, 2021;

   vii. Approximately $30,000.00 in U.S. currency, seized on or about April 13, 2021;

   viii. Approximately $23,000.00 in U.S. currency, seized on or about April 13, 2021;

   ix. Approximately $20,000.00 in U.S. currency, seized on or about April 26, 2021; and

   x. Approximately $606,060.00 in U.S. currency, seized on or about December 22, 2022.

*See* Didier Decl., attached as Ex. 1.

On December 20, 2022, the Court accepted the Defendant's guilty plea to Count 1 of the Information. *See* Minute Entry, ECF No. 26; Plea Agreement ¶ 1, ECF No. 28. As part of the guilty plea, the Defendant agreed to a forfeiture money judgment in the amount of gross proceeds he obtained. Specifically, among other provisions in the Plea Agreement, the Defendant agreed to the following:

> 13.   The defendant agrees, in an individual and any other capacity, to forfeit to the United States voluntarily and immediately, any right, title, and interest to any property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly, as a result of the commission of the offense, in violation of 18 U.S.C. § 1349, pursuant to 18 U.S.C. § 982(a)(2)(A). In addition, the defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

In addition, the Defendant has agreed to the forfeiture of the above-listed currency. *See* March 6, 2023 E-mail correspondence (on file with Government counsel).

In support of the guilty plea, the Defendant executed a Factual Proffer, and the Court found that there was a factual basis to support the Defendant's conviction. *See* Factual Proffer, ECF No. 29.

## II. MEMORANDUM OF LAW

### A. Directly Forfeitable Property

Any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of a wire-fraud offense affecting a financial institution is is subject to forfeiture. 18 U.S.C. § 982(a)(2)(A).

If a defendant is convicted of such violation, the Court "shall order" the forfeiture of property as part of the sentence. *See* 18 U.S.C. § 982(a)(2). Criminal forfeiture is governed by the preponderance standard. *See United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003). Upon finding that property is subject to forfeiture by a preponderance, the Court:

> . . . must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

Fed. R. Crim. P. 32.2(b)(2)(A). To the extent there is a third-party interest to any forfeited asset, such claims are addressed after the property is preliminary forfeited, in third-party ancillary proceedings. *See* 21 U.S.C. § 853(k), (n); Fed. R. Crim. P. 32.2.

### B. Difference Between Forfeiture and Restitution

Both forfeiture and restitution are mandatory in criminal cases. *See United States v. Brummer*, 598 F.3d 1248, 1250-51 (11th Cir. 2010) (the word "shall" does not convey discretion and the district court was required to order forfeiture of the property in accordance with Fed. R.

3

Crim. P. 32.2); 18 U.S.C. § 3664(f)(1)(A) (requiring district courts to order restitution in the full amount of each victim's losses). Although sometimes conflated, forfeiture and restitution serve different purposes. "While restitution seeks to make victims whole by reimbursing them for their losses, forfeiture is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice." *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014) (citing *United States v. Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007), *United States v. Venturella*, 585 F.3d 1013, 1019-20 (7th Cir. 2009), and *Libretti v. United States*, 516 U.S. 29, 39 (1995)). Because of this distinction, the Eleventh Circuit has repeatedly held that district courts cannot use restitution to offset the forfeiture amount ordered, or vice versa. *See United States v. Hernandez*, 803 F.3d 1341, 1343-44 (11th Cir. 2015); *Joseph*, 743 F.3d at 1354 ("In light of the statutory framework governing restitution and forfeiture, we hold that a district court generally has no authority to offset a defendant's restitution obligation by the value of forfeited property held by the government, which is consistent with the approach taken by the Fourth, Seventh, Eighth, Ninth, and Tenth Circuits."); *United States v. Bane*, 720 F.3d 818, 827 n.8 (11th Cir. 2013); *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344-45 (11th Cir. 2009); *Browne*, 505 F.3d at 1281 (finding defendant's disgorgement of illicit profits did not divest the United States of its forfeiture interest in the full amount of offense).

### C. Property Subject to Forfeiture in Instant Criminal Case

### The Paycheck Protection Program

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering from the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable

4

loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

To obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan, under nearly all circumstances, was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

**The Economic Injury Disaster Loan Program**

Another related response to the COVID-19 outbreak was an expansion of an existing disaster-related program – the Economic Injury Disaster Loan ("EIDL") – to provide for loan assistance (including $10,000 advances) for small businesses and other eligible entities for loans up to $2 million.  The EIDL proceeds could have been used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds were not intended to replace lost sales or profits, or for the expansion of a business.

Unlike certain other types of SBA-guaranteed loans, EIDL funds were issued directly from the United States Treasury, and applicants applied for EIDL funds directly through the SBA via an online portal and application.  The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including: information about the gross revenues for the business prior to January 31, 2020; and the cost of goods sold.  Applicants electronically certified that the information provided was true and accurate and were warned that any false statement or misrepresentation to the SBA, or any misapplication of loan proceeds, may result in sanctions, including criminal penalties.

EIDL applications were received in and processed using computer servers located in the states of Iowa, Virginia, and Washington.  EIDL disbursement payments were initiated by the SBA using computer servers located in the state of Colorado, which transmitted the payment information to the Treasury using computer servers located in the state of Virginia.

**Overview of the Defendant's Conspiracy**

Between approximately April 2020 and at least July 2021, the defendant agreed with Erich Javier Alfonso Barata ("Alfonso"), Armando De Leon ("De Leon"), and others to submit false and fraudulent PPP and EIDL applications and share in a percentage of the resulting fraudulent loans.

Throughout the course of the conspiracy, the defendant was a Regional Manager at Bank 1, one of the country's ten largest banks. Bank 1 was headquartered in New Jersey with branches in the Southern District of Florida. Bank 1 was an approved SBA lender of PPP loans and insured by the Federal Deposit Insurance Corporation ("FDIC").

Pursuant to the conspiracy, the defendant and his conspirators submitted over 80 false and fraudulent PPP loan applications at Bank 1 and Bank 2, another FDIC-insured bank and approved SBA lender of PPP loans. Bank 2 was also the defendant's previous employer. More than 50 of the applications were approved, and the defendant and his conspirators received over $17 million.

### Defendant Conspired with Erich Alfonso

Early in the PPP program, the defendant agreed with Alfonso, then a Bank 1 customer, to prepare and submit false and fraudulent PPP loan applications. The defendant spoke with Alfonso in the Southern District of Florida and they agreed to split a share of the loan proceeds, which Alfonso was to collect from the borrowers.

For example, in approximately April 2020, Alfonso submitted online at Bank 1 two false and fraudulent PPP loan applications on behalf of two entities he controlled, Black Hookah, Inc. and EJ Networking & Security Service Inc. Both applications misrepresented the number of employees and average monthly payroll of each entity. Alfonso notified the defendant once the loans were submitted and, in response, the defendant followed-up on the applications within Bank 1 to ensure each application was timely reviewed.

Bank 1 in fact approved both applications and deposited, into accounts Alfonso controlled, approximately $633,500. Alfonso then paid the defendant a cash commission for his assistance.

Another example of Alfonso and the defendant's collaboration:

- On approximately April 10, 2020, Alfonso emailed the defendant, at his Bank 1 email

account, information concerning Florida Entity 1, including a copy of the driver's license of Florida Entity 1's owner. The defendant forwarded Alfonso's email to a Bank 1 employee but deleted all references to Alfonso. That Bank 1 employee subsequently opened an account at Bank 1 in the name of Florida Entity 1 and ending in 9148 ("Account 9148").

- Two days later, approximately Sunday, April 12, 2020, Alfonso texted the defendant that he was planning to submit three PPP loan applications, including one on behalf of Florida Entity 1.

- That same day, the defendant replied, "Llámame[.]" (English translation: Call me.)

- Approximately that same day, Alfonso submitted a false and fraudulent PPP loan application on behalf of Florida Entity 1. Even though the company had not reported any employment activity with the Florida Department of Revenue, as all Florida-based employers are required to, nor had it filed a single tax return with the Internal Revenue Service, the PPP loan application stated that the company had 27 employees and had an average monthly payroll of $210,600.

- Minutes later, at approximately 10:09 p.m., the defendant used his Bank 1 email account to email Bank 1 employee "N.A." and ask that she complete reviewing Florida Entity 1's PPP loan application and notify the defendant when complete.

- Approximately the following day, April 13, 2020, N.A. emailed the defendant, "DONE."

- On approximately April 20, 2020, Florida Entity 1 received $526,500 in fraud proceeds into Account 9148.

- On approximately April 28, 2020, the proprietor of Florida Entity 1 transferred $480,000 of the $526,500 loan to a newly opened account in the name of Florida Entity 1 at Bank 3.

The defendant and Alfonso had a disagreement in 2020 relating to the borrowers' purported tax consequences stemming from the fraudulent loans. The defendant returned to Alfonso at least a portion of the fraudulent loan commissions that Alfonso had paid him. The defendant and Alfonso did not work together in 2021 when the SBA launched a second round of the PPP program.

### Defendant Conspired with Armando De Leon

In 2021, instead of working with Alfonso, the defendant worked with De Leon. The two had worked together at Bank 1 until January 2021, when Bank 1 terminated De Leon's employment based on his submission of two fraudulent PPP loan applications on behalf of entities he controlled. The defendant and De Leon agreed to work together to prepare and submit false and fraudulent loan applications for both the PPP and EIDL programs.

One critical task De Leon executed was monitoring the status of conspiracy's fraudulent applications by maintaining spreadsheets that catalogued the relevant information of each application. One spreadsheet, titled "PPP," recorded information for over 80 PPP loan applications filed at Bank 1. The information included each application's loan number, requested amount, which employee at Bank 1 was reviewing the loan, and what fee the applicant agreed to pay the conspirators.

De Leon reviewed the spreadsheet with the defendant at least once. On one occasion, De Leon brought his own laptop to the defendant's home, printed out the spreadsheets using the defendant's color printer, and reviewed the document with the defendant.

In addition to monitoring the status of the conspiracy's applications, De Leon received, on

behalf of himself and the defendant, certain commissions from co-conspirators who received fraudulent loans. For example, on approximately February 25, 2021, De Leon deposited into a bank account he controlled at Bank 4 and ending in 1225 a cashier's check from Bank 1 for $29,400. The check had been purchased by the owner of AC Export Express Corp., a company that had recently received a fraudulent PPP loan from Bank 1 in the amount of $488,320. The cashier's check for $29,400 constituted De Leon and the defendant's commission for their assistance with securing the fraudulent loan.

Based on the record in this case, the following specific property is directly subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(2)(A) as proceeds of the wire-fraud conspiracy:

   i.   Approximately $26,900 in U.S. currency, seized on or about March 11, 2021;
   ii.  Approximately $16,500 in U.S. currency, seized on or about March 11, 2021;
   iii. Approximately $20,000.00 in U.S. currency, seized on or about March 16, 2021;
   iv.  Approximately $20,000.00 in U.S. currency, seized on or about March 29, 2021;
   v.   Approximately $22,450.00 in U.S. currency, seized on or about March 29, 2021;
   vi.  Approximately $30,030.00 in U.S. currency, seized on or about March 31, 2021;
   vii. Approximately $30,000.00 in U.S. currency, seized on or about April 13, 2021;
   viii.Approximately $23,000.00 in U.S. currency, seized on or about April 13, 2021;
   ix.  Approximately $20,000.00 in U.S. currency, seized on or about April 26, 2021; and
   x.   Approximately $606,060.00 in U.S. currency, seized on or about December 22, 2022.

*See* Didier Decl., attached as Ex. 1.

Accordingly, the Court should issue the attached proposed order, which provides for the

forfeiture of specific property; the inclusion of the forfeiture as part of the Defendant's sentence and judgment in this case; and permission to conduct discovery to locate assets ordered forfeited.

WHEREFORE, pursuant to 18 U.S.C. § 982(a)(2)(A), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States respectfully requests the entry of the attached order.

## LOCAL RULE 88.9 CERTIFICATION

Pursuant to Local Rule 88.9, I hereby certify that the undersigned counsel has conferred with defense counsel via e-mail on March 6, 2023, and there is no objection to the relief sought.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: *Joshua Paster*
Joshua Paster
Court ID No. A5502616
Assistant United States Attorney
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9342
Facsimile: (305) 536-4089
joshua.paster@usdoj.gov

*Counsel for United States of America*